IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RCA RE HOLDINGS, LLC., and
BREEZY POINT APTS LLC,

                    Plaintiffs,

   -against-

LISAMAX HOLDING CORPORATION, INC., and
ALLEN MYERSON,

                    Defendants.

**VERIFIED COMPLAINT**

Index No.:

## INTRODUCTORY STATEMENT

Plaintiffs RCA RE Holdings, LLC ("RCA") and Breezy Point Apts LLC ("Breezy")(collectively "Plaintiffs"), bring this Complaint against Defendants Lisamax Holdings Corporation, Inc. ("Lisamax") and Allen Myerson ("Myerson") (collectively "Defendants"), as a consequence of Lisamax's breach of the Secured Promissory Note and Loan Agreement, dated September 17, 2018 ("Promissory Note"), entered into by Lisamax in favor of RCA and pursuant to which RCA loaned Lisamax the sum of $500,000 on the terms stated therein, and Lisamax's breach of the Operating Agreement of Breezy Point Apts LLC, dated as of August 27, 2018 ("Operating Agreement"), executed by Lisamax on November 6, 2018 and pursuant to which Lisamax subscribed to purchase 24 Ownership Units of Breezy for the aggregate purchase price of $6,000,000. After Lisamax's breaches of both the Promissory Note and Operating Agreement, Plaintiffs learned that they had been fraudulently induced to enter into these agreements based on Myerson's misrepresentations about his own and Lisamax's solvency, and assurances that Defendants would invest more money in Plaintiffs' real estate projects. Myerson, a paraplegic, preyed on the sympathy and compassion of his trusted friends and business associates, and

defrauded them out of millions of dollars in a nefarious scheme over the course of nearly two years.

## JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as Plaintiffs are citizens of the state of Delaware and Defendants Lisamax and Myerson are citizens of the state of Nevada and the state of California, respectively, and the amount in controversy is in excess of $75,000.00.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in the state of New York.

## APPLICABLE LAW

3.      New York law is applicable to the Promissory Note at issue pursuant to Section 16 of said Promissory Note, and Delaware law is applicable to the Operating Agreement pursuant to Section 12.3 of said Operating Agreement.

## PARTIES

4.      Plaintiff RCA RE Holdings, LLC is a Delaware limited liability company, formed on July 5, 2017, with a registered service address at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805 and having a principal office located 46 Main Street, Suite 339, Monsey, New York 10952.

5.      RCA is in the business of real property investment.

6.      Plaintiff Breezy Point Apts LLC is a Delaware limited liability company, formed on August 27, 2018, with a registered service address at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805 and having a principal office located 46 Main Street, Suite 339, Monsey, New York 10952.

7.     Breezy is a special purpose vehicle formed for the purpose of holding real property.

8.     Defendant Lisamax Holdings Corporation, Inc., is a Nevada Corporation, formed on February 3, 2010; E0043632010-2, with a registered service address at 6170 W. Lake Mead Boulevard, #1225, Las Vegas, Nevada 89108.

9.     Upon information and belief, Lisamax functions as a holding company to control equity stakes in a variety of entities.

10.     Upon information and belief, Defendant Allen Myerson is the current President, Secretary, and Treasurer of Lisamax and was President at all times described herein.

11.     Upon information and belief, Defendant Allen Myerson is an individual residing at 11049 McCormick Street, #414, Los Angeles, California, 91601.

**FACTS**

12.     On or around August 8, 2018, Defendant Myerson approached RCA to discuss the possibility of RCA making an investment in Nexion Biosciences, Inc. ("Nexion"), a company focused on the agricultural industry.

13.     Prior to August of 2018, Defendant Myerson had a pre-existing relationship with the principals of RCA and had always represented himself as an independently wealthy and trustworthy individual. By way of example, Mr. Myerson made representations that his family had sold its candy company for several billion dollars and in December of 2017, Myerson sent RCA a screenshot of Lisamax's Chase account showing a balance of over $250 million in Lisamax's business accounts. *See Chase Snapshot attached hereto as Exhibit "A"*.

14.     In response to Myerson's proposal for Nexion, RCA explained to Myerson that its focus was on real estate investment, specifically apartment acquisition and management, but

nevertheless, despite the fact that Nexion was outside its scope of RCA's business, RCA would be willing entertain the opportunity to invest in Nexion, in substantial part because Myerson was the source of the investment opportunity.

15.     RCA made clear it would entertain the investment opportunity in Nexion in return for Myerson considering investment opportunities in real estate projects.

16.     On September 4, 2018, pursuant to discussions with Myerson, Mark Silber ("Silber"), a principal of RCA, sent Myerson the model and financials for Breezy, which owns the Breezy Point Apartments located in Norfolk, Virginia.

17.     In addition to being a principal of RCA, Silber is the principal owner of the entity that operates as the managing member of Breezy.

18.     The following day, on September 5, 2018, Myerson stated to Silber in an e-mail that the best way for RCA to invest in Nexion would be to purchase 10,000 of his shares. He further made representations guaranteeing that "RCA would bring in $1,679,000 in about six months on a $500,000 investment."

19.     Later that day, Silber expressed concerns to Myerson via e-mail that, in addition to this being an unorthodox investment for RCA, RCA had not done any due diligence on Nexion. Silber went on to request assurances from Myerson that the diligence Myerson conducted on Nexion made Myerson comfortable.

20.     In response, Myerson stated that his due diligence made him "[c]omfortable enough to give [Nexion] $2.5 million."

21.     On September 6, 2018, Myerson wrote to Silber and continued to push the Nexion investment on RCA and included that "I will also have my attorney write in a clause in which I will back original investment."

22.     Silber responded by telling Myerson that as they were finalizing the Nexion investment, he wanted to make clear that RCA's primary focus was its real estate projects and that RCA was putting its entire faith in Myerson on the Nexion investment with the hope of building trust for future deals and a long-term partnership.

23.     Myerson responded later that day reiterating that the investment was "extremely low risk and extremely high performance" and again assured Silber that Myerson would back the purchase of the stock with his own cash.

24.     The next day, September 7, 2018, Silber e-mailed Myerson stating that he was pleased to learn that Myerson had applied for $12 million in availability for Breezy.

25.     Myerson responded that day that he would "look to move $12mm in your direction" and that "there is very little required to get the liquidity."

26.     On September 10, 2018, Myerson e-mailed Silber stating that he had "put the numbers together with regard to the $12 million." He also stated that he had "an idea with regard to maybe increasing that some and creating a draw for any interesting [real estate] opportunities" that RCA may pursue in the future.

27.     Myerson followed up on his September 10, 2018 e-mail with an e-mail on September 12, 2018 stating that he had a good idea for a partnership "akin to a private equity group for real estate" and that his thought was to "fund up to $100mm or more with $20mm monthly for 5 months and let [RCA] draw as quality projects come onto [RCA's] radar."

28.     On September 12, 2018, the parties began to prepare an agreement to memorialize the investment in Nexion.

29.     Despite being told by Myerson that Nexion had been trading publicly in the Caribbean, RCA could not find any record of Nexion trading publicly anywhere.

30.     Due to RCA's concerns about a direct investment in Nexion, it decided not to directly invest in Nexion, and to instead structure the deal as a $500,000 loan between RCA and Lisamax with the Nexion stock acting as collateral.

31.     On September 16, 2018 Myerson sent an email to Silber assuring him that Myerson would provide financial information for both himself and Lisamax, and that he was working to secure $6 million in funds for Breezy in addition to the funds for the $100 million draw for real estate projects. Myerson had unilaterally decided to scale down the investment in Breezy from $12 million to $6 million.

32.     The same day, Myerson sent Silber a snapshot of a JP Morgan Chase Bank account for Lisamax Holding Corporation Inc. that showed a total balance for the period of August 2018 over $4 million comprising approximately $1.6 million in checking and $2.4 million in savings. *See Chase Snapshot attached hereto as Exhibit "B"*.

33.     On September 17, 2018, Myerson e-mailed Silber stating that he was "reasonably certain that the $6mm in the bag" for Breezy.

34.     Later that day, on September 17, 2018, Lisamax entered into the Promissory Note in favor of RCA, whereby Lisamax agreed to borrow Five Hundred Thousand Dollars $500,000 from RCA on the terms stated therein. *See Secured Promissory Note and Loan Agreement attached hereto as Exhibit "C"*.

35.     The Promissory Note provided that the principal amount of $500,000 borrowed would become due Three Hundred and Sixty-Five (365) days from September 17, 2018 ("Inception Date"), with interest calculated and paid on a yearly basis on the outstanding principal balance, at an interest rate of Twenty-Four percent (24%) per annum. *See Promissory Note § 1.*

36.     A single payment was to be made to RCA by Lisamax for the outstanding principal balance and full amount of interest no later than Three Hundred and Sixty-Five (365) days from the Inception Date. *See Promissory Note § 2.*

37.     Under the Promissory Note, a failure by Lisamax to make a payment within the ten (10) day grace period following the Three Hundred Sixty-Five (365) days from the Inception Date permits RCA to impose a penalty of Three Hundred and Fifty Dollars ($350.00) ("Deliquency Penalty"). Delinquency in any payments for a period of ninety (90) days or more constitute an event of default. *See Promissory Note § 3.*

38.     To avoid an event of default under the Promissory Note, Lisamax was required to make payment of the outstanding principal and interest, plus Deliquency Penalty, within 90 days of September 27, 2019.

39.     Lisamax was required to make payments to RCA at 46 Main Street, Suite 339, Monsey, New York 10952. *See Promissory Note § 5.*

40.     As security for payment of the principal and interest due under the Promissory Note, Lisamax granted RCA a security interest in Ten Thousand (10,000) shares of Class A stock in Nexion Biosciences, Inc. as collateral ("Collateral"). *See Promissory Note § 6.*

41.     Under Section 9 of the Promissory Note, Lisamax had several duties, including but not limited to the following:

a.   To pay all of its obligations;

b.   To protect and prevent waste of the Collateral;

c.   To maintain adequate liability and property insurance sufficient to protect the Collateral;

d.   To pay all business personal property taxes and other assessments on the Collateral and to prevent any liens of any kind from attaching to the Collateral;

e.   To not give any security interest in any of the Collateral or permit any liens to be placed on the Collateral, without the prior written consent of RCA;

f.   To execute any deeds of trust, financing statements or other instruments that may be necessary and appropriate to enable RCA to perfect its security interest in the Collateral; and

g.   To permit RCA, either in person or by agent, at any and all reasonable times and at reasonable intervals to enter the premises where the Collateral is located and inspect the Collateral.

42.    On September 17, 2018, RCA wired the $500,000 to Lisamax from RCA's account at The Westchester Bank located at 12 Water Street, White Plains, New York 10601. *See The Westchester Bank Screenshot attached hereto as Exhibit "D".*

43.    After execution of the Promissory Note, contrary to all of his prior representations, Myerson suddenly developed difficulties procuring the $6 million investment sought by RCA for Breezy.

44.     Myerson began to cite health issues that impeded his ability to support the representations he made regarding investing in Breezy.

45.     On October 9, 2018, Myerson e-mailed Fred Schulman ("Schulman"), a principal of RCA, and Silber that he left a voicemail for "Jeff at Chase" to "process out $6mm over to [Breezy]."

46.     Nearly a month later, on November 6, 2018, Myerson, on behalf of Lisamax, executed the Operating Agreement and the accompanying Investor Questionnaire subscribing for an investment in Breezy in an amount of $6 million. *See Operating Agreement attached hereto as Exhibit "E".*

47.     Pursuant to Section 4.2 of the Operating Agreement, Lisamax was obligated to have already or "contemporaneously with the execution of its Member Signature Page," contribute to the capital of Plaintiff Breezy, "the full amount of its required initial capital contribution as set forth on its Member Signature Page."

48.     The Member Signature Page signed by Myerson on behalf of Lisamax stated the Initial Capital Contribution of Lisamax to be $6 million. *See Operating Agreement Exhibit A.*

49.     Three days after execution of the Operating Agreement, on November 9, 2018, Myerson e-mailed Schulman that a wire to Breezy in the amount of $6,150,000.00 was sent at 2:15 p.m. Pacific Standard Time. Myerson also included a screenshot of wire activity from what purported to be Lisamax's Chase Account, showing the pending wire with a wire date of November 9, 2018 for $6,150,000. *See Snapshot attached as Exhibit "F".*

50.     On November 14, 2018, Myerson sent an e-mail to Schulman attaching an account summary for Lisamax, showing over $6.4 million in its checking account and over $1.9 million in its savings account. *See Account Summary attached hereto as Exhibit "G"*.

51.     Two days later, Myerson e-mailed Schulman again stating that he was speaking to Jeff at Chase and "everything is on track."

52.     The next day, on or about November 17, 2018, Myerson forwarded an e-mail to Schulman from Jeff Gonzalez at Chase that stated that the wire was still being processed and the situation was "a little more complicated since [Chase] cannot use [Myerson's] margin account you raise the capital." Mr. Gonzalez also stated that they were "close to the finish line" and "should be able to wrap this up imminently."

53.     On November 25, 2018 Myerson e-mailed Schulman stating that he was still very ill but would "get an update from the bank in the morning."

54.     Between November 25, 2018 and January of 2019, Schulman frequently called Myerson to inquire about the status of the wire.

55.     On January 10, 2019, Myerson forwarded Schulman another e-mail from Jeff Gonzalez stating compliance had been wrapped up on Myerson's credit line and that Chase would "submit [Myerson's] wire request tomorrow morning".

56.     Between January 10, and April of 2019, RCA constantly contacted Myerson seeking the $6 million owed to Breezy.

57.     Mr. Myerson continued to string along RCA for months prompting Silber to request the $500,000 RCA loaned Lisamax back in April of 2019.

58.     In response, Mr. Myerson stated he would get the money back to RCA.

59.     Between April and June of 2019, Mr. Myerson told RCA that he was trying to get the shares of Nexion sold to pay back RCA with no success.

60.     On June 4, 2019, Myerson e-mailed Schulman stating that he had $6.75 million for RCA; representing $6 million to fulfill Lisamax's obligations under the Operating Agreement and $750,000 to satisfy the Promissory Note.

61.     Approximately three months later, on September 2, 2019, RCA still had received no funds from Myerson, Lisamax or Nexion and Silber sent Myerson a reminder e-mail that the Promissory Note due date was rapidly approaching.

62.     Myerson responded the same day saying that his attorney, Bob Epstein, would see to payment of the Promissory Note.

63.     The next day, Myerson stated that the Promissory Note would be paid on September 19, 2019 and that he would need a letter relinquishing all claims at Nexion.

64.     On September 18, 2019, Myerson e-mailed that he would pay $750,000 to RCA through his attorneys, but qualified that statement by stating "this money was for investment purposes and not really a loan."

65.     The next day, Silber asked when to expect the funds and Myerson refused to give him a hard date and invited Silber to see him in court, maintaining that the Promissory Note was not a loan.

66.     On September 20, 2019, counsel for Lisamax stated to RCA that, pursuant to the terms of the Promissory Note, in order to avoid default under § 3 of the Promissory Note, Lisamax would "make payment of the outstanding principal and interest within ninety (90) days of

September 27, 2019." *See E-mail from Eric Nishizawa dated September 20, 2019 attached hereto as Exhibit "H".*

67.     Lisamax defaulted on the Promissory Note, when it failed to make any payments on the $500,000 and interest accrued thereon, and the Delinquency Penalty, owed to RCA within ninety (90) days of September 27, 2019.

68.     Despite countless assurances from Myerson, Lisamax has not repaid any portion of the principal balance or interest accrued thereon, or the Delinquency Penalty, owed to RCA under the Promissory Note.

69.     Despite representations made by Myerson that Lisamax would remit payment due under the Operating Agreement, neither Lisamax nor Myerson has ever invested in Breezy or any other RCA real estate projects.

70.     Furthermore, neither Myerson nor Lisamax ever took any affirmative steps to set-up the larger $100 million real estate fund.

71.     Both the Promissory Note and Operating Agreement were primarily negotiated by the parties while officers of RCA and Breezy were situated in New York.

72.     After nearly a year and a half of relying on Myerson and Lisamax's misrepresentations, and despite efforts to resolve the issues without involving the court, RCA initiates the present action.

## AS AND FOR A FIRST CAUSE OF ACTION
### Breach of the Promissory Note - Lisamax

73.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in preceding paragraphs as though fully set forth herein.

74.     Lisamax entered into a valid Promissory Note in favor of RCA.

75.     Lisamax breached its obligations under the Promissory Note when it failed to pay the sums owed to RCA not later than ninety (90) days of September 27, 2019 in accordance with the terms of the Promissory Note.

76.     As a consequence of Lisamax's breach, RCA has been injured through the loss of its $500,000 loan, plus interest accrued thereon, plus the Delinquency Penalty.

77.     As a consequence of Defendant Lisamax's breach, Plaintiff RCA is entitled to damages in an amount to be determined at the trial of this action, but no less than $500,000, plus penalties, interest, costs, expenses and attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION

### Unjust Enrichment - Lisamax

78.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in preceding paragraphs as though fully set forth herein.

79.     Lisamax was unjustly enriched when it accepted payment of the $500,000 loan from RCA and did not pay back the $500,000 principal balance plus interest accrued thereon, plus Delinquency Penalty, within ninety (90) days of September 27, 2019.

80.     Lisamax was unjustly enriched at RCA's expense when it kept the $500,000 loan without paying the principal balance or interest owed to RCA.

81.     It is against equity and good conscience to permit Lisamax to retain the money RCA seeks to be recovered.

82.     As a consequence of Defendant's unjust enrichment, Plaintiff RCA is entitled to damages in an amount to be determined at the trial of this action, but no less than $500,000, plus interest, costs and expenses.

### AS AND FOR A THIRD CAUSE OF ACTION

**Breach of the Breezy Operating Agreement - Lisamax**

83.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in preceding paragraphs as though fully set forth herein.

84.     Lisamax executed the Operating Agreement for Breezy.

85.     The Operating Agreement is a valid and enforceable contract.

86.     Lisamax breached its duties under the Operating Agreement, when it failed to remit payment for its initial capital contribution to Breezy of $6 million prior to or contemporaneously with its execution.

87.     As a consequence of Lisamax's breach, Breezy has been injured as it was forced to find an alternative party to compensate for Lisamax's failure to make its $6 million contribution to Breezy.

88.     As a consequence of Defendant's breach, Plaintiff Breezy is entitled to damages in an amount to be determined at the trial of this action, plus costs, expenses and attorneys' fees.

### AS AND FOR A FOURTH CAUSE OF ACTION

**Fraud in the Inducement on the Promissory Note - Myerson**

89.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in preceding paragraphs as though fully set forth herein.

14

90.     Myerson made misrepresentations or omissions of material fact when he made assurances about his individual solvency and the solvency of Lisamax.

91.     Myerson made misrepresentations or omissions of material fact when he assured RCA he would invest in Breezy and other RCA real estate projects.

92.     Myerson made misrepresentations or omissions of material fact when he told RCA about the benefits of acquiring Nexion stock.

93.     Myerson knew said misrepresentations or omissions of material fact were false at the time he made these statements to RCA.

94.     Myerson made such misrepresentations or omissions with the intention of inducing RCA's reliance.

95.     RCA reasonably relied upon Myerson's misrepresentations or omissions and entered into the Promissory Note with Lisamax.

96.     As a consequence of RCA's reasonable reliance on Myerson's misrepresentations or omissions, RCA agreed to make the loan to Lisamax and was injured when, after Lisamax entered into the Promissory Note in RCA's favor and received the loan proceeds, Lisamax defaulted on the Promissory Note.

97.     As a consequence of Defendant's fraud in the inducement, Plaintiff RCA is entitled to damages in an amount to be determined at the trial of this action, including punitive damages, plus costs, expenses and attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION

### Fraud in the Inducement on the Operating Agreement - Myerson

98.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in preceding paragraphs as though fully set forth herein.

99.     Myerson made misrepresentations or omissions of material fact when he made assurances about his individual solvency and the solvency of Lisamax.

100.    Myerson made misrepresentations or omissions of material fact when he made assurances about his ability and the ability of Lisamax to invest in Breezy.

101.    Myerson knew said misrepresentations or omissions of material fact were false at the time he made these statements to Breezy.

102.    Myerson made such misrepresentations or omissions with the intention of inducing Breezy's reliance.

103.    Breezy reasonably relied upon Myerson's misrepresentations or omissions and entered into the Operating Agreement with Lisamax.

104.    As a consequence of Breezy's reasonable reliance on Myerson's misrepresentations or omissions, Breezy was injured when, following Lisamax's execution of the Operating Agreement, Lisamax failed to pay its initial capital contribution in the amount of $6 million to Breezy.

105.    As a consequence of Myerson's fraud in the inducement, Plaintiff Breezy is entitled to damages in an amount to be determined at the trial of this action, including punitive damages, plus costs, expenses and attorneys' fees.

## AS AND FOR A SIXTH CAUSE OF ACTION

### Common Law Fraud - Myerson

106.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in preceding paragraphs as though fully set forth herein.

107.     Myerson, in his individual capacity, and as an officer of Lisamax, knowingly made numerous misrepresentations and/or omissions of material fact with the intent to defraud Plaintiffs.

108.     Plaintiffs reasonably relied on Myerson's misrepresentations and/or omissions.

109.     Myerson, individually and as an officer of Lisamax, failed to disclose materials facts to Plaintiffs with the intent to defraud Plaintiffs.

110.     Myerson knew that Plaintiffs were acting on the basis of the fraudulent information provided by Myerson.

111.     Plaintiffs reasonably relied upon Myerson's misrepresentations or omissions and entered into the Promissory Note and Operating Agreement with Lisamax.

112.     As a consequence of Plaintiffs' reasonable reliance on Myerson's misrepresentations or omissions, Plaintiffs were injured when, after Lisamax entered into the Promissory Note in RCA's favor and received the loan proceeds, and Lisamax defaulted on the Promissory Note, and when, following Lisamax's execution of the Operating Agreement, Lisamax failed to pay its initial capital contribution in the amount of $6 million to Breezy.

113.     As a result, Plaintiffs have suffered damages in an amount to be determined at the trial of this action, including punitive damages, plus costs, expenses and attorneys' fees.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation - Myerson

114.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in preceding paragraphs as though fully set forth herein.

115.    Myerson, in his individual capacity, had a long-standing relationship with officers of RCA.

116.    Myerson, having conducted his own due diligence on Nexion and having the intrinsic knowledge about Lisamax, had a duty to provide accurate information to RCA regarding both entities.

117.    Myerson was aware that the representations made about Lisamax's financial viability, Lisamax and Myerson's prospective investments in RCA projects and the projected success of the Nexion investment opportunity, were for the specific benefit of RCA and were being relied upon by RCA for the purposes of entering into the Promissory Note.

118.    Myerson acted negligently, carelessly or without due diligence in imparting the misrepresentations to RCA and acted negligently, carelessly or without due diligence by omitting necessary facts.

119.    Myerson knew, or should have known, or reasonably expected that the misrepresentations would be relied upon by RCA to its detriment.

120.    As a proximate result, RCA has suffered damages in an amount to be determined at the trial of this action, including punitive damages, plus costs, expenses and attorneys' fees.

**WHEREFORE,** for the foregoing reasons, Plaintiffs request that the Court enter judgment in their favor and against Defendants as follows:

1. Awarding to Plaintiffs compensatory damages, plus pre-judgment interest calculated at the statutory rate of nine (9) percent;

2. Awarding to Plaintiffs punitive and exemplary damages;

3. Attorney fees;

4. Costs and expenses; and

5. Awarding such other and further relief as the Court deems just and proper, including the costs and disbursements of this action.

Dated: February 27, 2020
     White Plains, NY

Daniel H. Roseman, Esq.
HINMAN, HOWARD & KATTELL, LLP
Attorneys for Plaintiff
707 Westchester Ave, Suite 407
White Plains, New York 10604
Telephone: (914) 694-4102

19

## VERIFICATION

STATE OF NEW YORK      )
                       ) SS:
COUNTY OF _Rockland_   )

_Moshe Silber_ being duly sworn, deposes and says that deponent is a principal for both Plaintiffs, RCA RE Holdings, LLC and Breezy Point Apts LLC, in the within action; that deponent has read the foregoing Verified Complaint and knowns the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes them to be true.

RCA RE HOLDINGS, LLC., and
BREEZY POINT APTS LLC

By: Mark Silber
Principal for RCA RE HOLDINGS,
LLC., and Principal owner of the
managing member entity for BREEZY
POINT APTS LLC

Subscribed and sworn to before me
This 27 day of February, 2020

Notary Public

ELIEZER MARTIN
NOTARY PUBLIC, STATE OF NEW YORK
No. 01MA6334362
Qualified in Rockland County
Commission Expires Dec. 14. 20. 23